UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA, *ex rel.*
JENNIFER BUTH, f/k/a JENNIFER DENK,

    Plaintiff,

    v.                                         Case No.  09-C-0720

PHARMERICA CORPORATION,

    Defendant.

---

UNITED STATES OF AMERICA,
STATE OF FLORIDA, and
COMMONWEALTH OF MASSACHUSETTS,
*ex rel.* ERIC BEEDERS and LESA MARTINO,

    Plaintiffs,

    v.                                         Case No. 11-C-706

PHARMERICA CORPORATION,
as successor in interest to Integrity
Pharmacy Services LLC,

    Defendant.

---

DECISION AND ORDER DENYING PHARMERICA CORPORATION'S MOTION
TO DISMISS THE COMPLAINT OF THE UNITED STATES (DOC. 56) AND
DENYING MOTION TO DISMISS RELATOR JENNIFER BUTH'S AMENDED
COMPLAINT (DOC. 62) AND SETTING SCHEDULING CONFERENCE

This *qui tam* action arises out of allegations that a long-term care pharmacy, PharMerica Corporation, caused the submission of false claims to Medicare for Schedule II drugs that were dispensed without valid prescriptions. A former PharMerica Pharmacy Operations Manager, Jennifer Buth (f/k/a Jennifer Denk), filed this suit after complaining to management of these practices and was then discharged. The government intervened in these proceedings with respect to allegations that PharMerica submitted false claims

to Medicare for controlled narcotic substances that were not eligible for reimbursement because they were dispensed without valid prescriptions.[1] PharMerica has moved to dismiss three counts of the complaint filed by the United States and the unlawful retaliation count of Buth's amended complaint. For the reasons set forth below, the motions to dismiss will be denied.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). In determining the sufficiency of a claim, the court construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (citation omitted). The complaint must contain sufficient factual matter that, when accepted as true, states a claim for relief that is plausible on its face. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 934–35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Nevertheless, claims under the False Claims Act, 31 U.S.C. § 3729, *et seq*. ("FCA"), an anti-fraud statute, are subject to the heightened pleading requirements of Rule 9(b). *U.S. ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005).

---

[1] The government declined to intervene in additional claims in the *Denk* action, which contend that PharMerica (1) submitted false claims to Medicare for Schedule II, IV, and V controlled narcotic substances, (2) caused false claims to be submitted by accepting, offering, or giving kickbacks, and (3) caused false claims to Medicare by failing to credit payments for returned medications. (Doc. 40.) Months later, Buth filed a stipulation with PharMerica to dismiss Counts 3 through 8 of the Relator's Amended Complaint. (Doc. 58.) Counts 1 and 2 of Buth's amended complaint have not been dismissed but the parties have agreed that the United States' complaint will be operative for those counts. (Docs. 55, 58, and 59.)

Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. See Fed. R. Civ. P. 9(b). This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)(citing *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011).

## COMPLAINT OF THE UNITED STATES

PharMerica is a long-term care pharmacy that dispenses drugs to residents of nursing homes and other long-term care facilities. (Doc. 44 at ¶ 3.) Between January 2007 and December 2009, PharMerica filled approximately 40 million prescriptions annually and approximately 45% of Pharmerica's revenue during this period came from prescription drugs paid for by the Medicare Part D program. (*Id.*) Many of the prescriptions filled between January 2007 and December 2009 were for controlled substances listed in Schedule II under the Controlled Substances Act, 21 U.S.C. § 801 ("CSA"). (*Id.* at ¶ 4.)

Because Schedule II drugs can cause significant harm if used improperly, the CSA prohibits any manufacturer, distributor, or dispenser -- including a pharmacy -- from distributing or dispensing a controlled substance without a valid prescription. 21 U.S.C. § 829(a) and (b). The prescription must be in writing except that a practitioner (physician, dentist, veterinarian or other licensed individual) may give an oral prescription in an emergency situation. 21 U.S.C. § 829(a); 21 C.F.R. § 1300.01(b)(7). No prescription for a Schedule II controlled substance may be refilled. 21 U.S.C. § 829(a). Moreover, nearly every state has adopted a version of the Uniform Controlled Substances Act and Wisconsin

3

law expressly prohibits anyone from dispensing a Schedule II controlled substance without the written hard copy or electronic prescription of a practitioner. Wis. Stat. § 961.38.

The voluntary prescription drug benefit program for Medicare enrollees is known as Medicare Part D. (*Id.* at ¶ 47.) Because Medicare Part D is based on a private market model, Medicare contracts with private entities, known as Part D Plan "sponsors," to administer prescription drug plans. (*Id.* at ¶ 48.) When a pharmacy – such as PharMerica – dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the Plan D plan sponsor for the costs that are not paid by the beneficiary. (*Id.* at ¶ 50.) The Part D plan sponsor then notifies the Centers for Medicare and Medicaid Services ("CMS") that a drug has been purchased and dispensed through a document called a Prescription Drug Event ("PDE") record, which includes data elements about the drug dispensed, the prescription, and the payment to the pharmacy. (*Id.* at ¶ 51.) Payments to the Part D plan sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program as set forth in 42 C.F.R. § 423.322. Essentially, each PDE submitted to CMS is a summary record documenting the final adjudication of a dispensing event based upon claims received from pharmacies and the data in PDEs are data related to the payment of claims. (*Id.* at ¶ ¶ 55, 56.)

Throughout the year, CMS makes prospective payments to Part D plan sponsors for three subsidies based on the sponsors' approved bids: (1) the direct subsidy designed to cover the sponsor's costs of providing the benefits; (2) the low-income cost-sharing subsidy; and the reinsurance subsidy. (*Id.* at ¶ 57.) Part D plan sponsors who fail to submit required claims-level information contained in the PDE to CMS risk having to return

4

monthly payments to CMS during reconciliation. *See* 42 C.F.R. § 423.343(b), (c)(2) and (d)(2). After the close of the plan year, CMS is responsible for reconciling the prospective payments to the Part D plan sponsor's actual allowable costs to calculate final payments and risk sharing amounts. CMS determines the actual allowable costs by relying upon data elements submitted by plan sponsors in their PDE records. (*Id.* at ¶ 62.)

PharMerica, as a subcontractor provider for Part D plan sponsors, is required to comply with all applicable federal laws, regulations, CMS instructions, including the CSA, the Social Security Act, and regulations defining the requirements of a valid prescription. 42 C.F.R. § 423.505(i)(4)(vi). Moreover, a Part D plan sponsor is obligated by federal regulation to certify the accuracy, completeness and truthfulness of all data related to the payment:

> (1) General Rule. As a condition for receiving a monthly payment ... the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must request payment under the contract on a document that certifies (based on best knowledge, information and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.
> ...
>
> (3) Part D Sponsor Certification of Claims Data: The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (Based on best knowledge, information and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement.

42 C.F.R. § 423.505(k)(1) & (3).

The "Certification of data that determines payments" provision of the applicable regulation further provides:

> "[i]f the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement."

42 C.F.R. § 423.505(k)(3).

The United States has alleged that PhaMerica pharmacies dispensed Schedule II drugs to residents of long-term care facilities without a valid prescription under applicable law. (Doc. 44 at §§ 79, 80.) Employees of the long-term care facility would send a request from facility staff rather than the treating physician, and, upon receipt of the request, PharMerica dispensed the drugs to the facility. (*Id.*) Simultaneously, the PharMerica pharmacist would create a template and send it to the physician for signature while exercising his or her own judgment regarding the quantity to dispense. Many of the templates were not returned and others were returned after the drug was dispensed. (*Id.*)

Between 2007 and 2009, employees at PharMerica-Pewaukee assigned quantities to the faxed requests and filled the orders while generating templates to send to the practitioner. Unsigned templates were placed in an accordion folder in the office and eventually assigned to an unmarked storeroom called the "Harry Potter room." (*Id.* at ¶ 81.) The United States contends that similar practices were discovered at the PharMerica pharmacy in Mountain View, California, and Longwood, Florida. (*Id.* at ¶ 82.)

Over a combined period of eight months (May - September 2008), PharMerica-Pewaukee dispensed Schedule II controlled substances at least 4285 times without a valid

prescription. (*Id.* at ¶ 85.) During this period, PharMerica made or caused to be made false or fraudulent PDEs that inaccurately reflected these drugs as covered Part D drugs, represented that the drugs were dispensed on a valid prescription, and inaccurately or incompletely identified the prescriber of the drug and the prescribers instructions. (*Id.* at ¶ 90.) In the process, PharMerica knowingly caused Part D plan sponsors to submit false certifications to Medicare that were material to the payment of the claims. (*Id.* at ¶ 92.) It is asserted that between January 1, 2007, and December 31, 2009, PharMerica caused false or fraudulent claims to be submitted on at least 250 occasions where Schedule II drugs were dispensed without a valid prescription. (*Id.* at ¶ 93.)

In the complaint, the United States has identified specific examples of false claims caused to be submitted by PharMerica wherein PharMerica submitted a request for payment to the patient's Part D plan and received payment for the drugs dispensed. Specifically, it is asserted that CMS made payments to the Part D plan sponsor in reliance on the submission of the PDE data. (*Id.* at ¶ 98-115.) The United States further alleges that PharMerica has been on notice since February of 2000 that its practices for dispensing Schedule II narcotics failed to comply with the CSA because DEA investigators audited a PharMerica pharmacy at that time. (*Id.* at ¶ 124.)

ANALYSIS

The court begins with the motion to dismiss the False Claims Act ("FCA") counts (three and four) as pled in the complaint of the United States. (Doc. 44.) Counts three and four cite to the revised provisions of the FCA, under which liability attaches to any person who "knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses or causes to be made

or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). As noted in the complaint, these provisions were amended and redesignated on May 20, 2009, by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat. 1616 (2009). The parties have not questioned whether the pre-FERA or post-FERA language applies, but it is noted that § 3729(a)(1)(B) was made retroactive to "all claims under the FCA pending on or after June 7, 2008," and there is no similar provision for § 3729(a)(1)(A). *U.S. ex. Rel. Loughren v. Unum*, 613 F.3d 300, 306, n. 7 (1st Cir. 2010) (quoting FERA § 4(f), 123 Stat. at 1624). Under the pre-FERA language, liability attached to any person who either "knowingly presents, or causes to be presented to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," *id.* § 3729(a(2). The government asserts, given the nature of the claims at issue, that all four versions are applicable here.

For purposes of the FCA, "knowing" and "knowingly" means that a person has actual knowledge, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity but does not require specific intent to defraud.[2] 31 U.S.C. § 3729(b)(1)(A) and (B). A "claim" is any request or demand for money that is presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A). Further, "material" means having a natural tendency to influence, or is capable of influencing, the government's payment decision. 31 U.S.C. § 3729(b)(4).

---

[2]FERA redesignated § 3729(b) as § 3729(b)(1)(A) & (B). However, the amended § 3729(b) is identical to the prior version except for the internal subdivisions.

8

PharMerica submits that the government's FCA claims are predicated on a fundamental misunderstanding of Medicare Part D. Rather than operating as a fee-for-service system in which the government pays for each prescription filled, Medicare Part D is a risk-sharing program pursuant to which plan sponsors provide prescription drug insurance to Medicare beneficiaries in exchange for fixed monthly payments from the CMS. The plan sponsors create data regarding the PDEs, but the PDEs are not used to calculate the fixed monthly payments to the plan sponsors. Further, PharMerica suggests it could not have caused the plan sponsors to falsely certify the accuracy of the PDE data because the certification states that it is made "to the best of their knowledge." Hence, if the plan sponsors certified that they were not aware of any inaccuracies, the certification could not have been false. Finally, PharMerica insists that any false PDE data was immaterial to the government's decision to pay the plan sponsors because the regulations allow plan sponsors to correct their data.

Mindful of the arguments of the parties, the sole issue at this stage is the sufficiency of the complaint. *See Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). To that end, the United States has pled that PharMerica submitted requests for payment to plan sponsors for drugs that were not covered and knowingly caused the Plan D plan sponsors to submit false or fraudulent claims for payment to CMS for ineligible drugs. By virtue of these acts, the complaint charges that PharMerica knowingly caused to be presented to an officer or employee of the United States false or fraudulent Medicare claims for payment or approval. (*Id.* at ¶¶ 143, 144.) The United States is proceeding under a theory that PharMerica's claims were factually false because they contained inaccurate descriptions of the goods and services provided (*id.* at ¶¶ 90, 94-115), as well a false

9

certification theory because the PDEs require an express certification regarding their validity and all contracts between Part D plan sponsors and downstream entities contain a provision whereby the subcontractor promises to comply with all applicable Federal laws, regulations and CMS instructions.  (*Id.* at ¶¶ 66, 68.)

When considering a motion to dismiss, the court examines the complaint to determine whether it states a claim, and, if so, whether it complies with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  Section 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1)) requires a "false or fraudulent claim" which was "knowingly" presented or caused to be presented to the government "for payment or approval."  Section § 3729(a)(1)(b) requires a false record or statement material to a false or fraudulent claim.

With due regard for Rule 9(b) and the aforementioned statutes, the court finds the complaint asserts that the United States has adequately pled a false or fraudulent claim inasmuch as PharMerica billed plan sponsors for Schedule II drugs knowing that the drugs were not dispensed upon a valid prescription and caused the plan sponsor, who relied on PharMerica's electronic claim, to inaccurately represent to the United States (CMS) in the PDE record that the drugs were reimbursable "covered Part D drugs." (Doc. 44 at ¶¶ 50-51, 55, 74, 75, 81-83, 90, 94-115.)  The PDEs submitted by the plan sponsor are the claims upon which CMS makes payment.  (*Id.* at ¶¶ 53-56.)  In the process of submitting the PDE, the plan sponsor certifies to the accuracy and truthfulness (*id.* at ¶¶ 66-72; C.F.R. § 423.505(k)(1) & (3)) and the plan sponsor's subcontracts with downstream entities contain language obligating the pharmacy to comply with all applicable federal laws, regulations and CMS instructions.  (*Id.* at ¶ 68; 42 C.F.R. § 423.505(i)(4)(iv)).

Next, the court looks for allegations that PharMerica acted "knowingly." Allegations of knowledge are found throughout the complaint, but at paragraphs 124-135, the United States cites specific instances where PharMerica demonstrated knowledge that it must have a prescription for the drug to be covered under Part D. As early as February of 2000, diversion investigators from the DEA advised PharMerica that it was not in compliance with the CSA because of its practices for dispensing controlled substances. (Doc. 44 at ¶ 124.) Then, in 2007, the PharMerica Compliance and Regulatory Affairs auditor prepared a Power Point Presentation describing PharMerica's practice of using the emergency prescribing rules to dispense controlled substances without a prescription and one of the slides said "[n] prescription equals a false claim." This same auditor discussed his concerns at a training meeting with PharMerica auditors and managers. (Doc. 44 at ¶¶ 130-131.) In addition, in May of 2008, the PharMerica Compliance Department asked each pharmacy to complete a "regulatory Self Analysis" and multiple pharmacies indicated that they had a significant number of unsigned Schedule II prescriptions (171 in Pewaukee, Wisconsin). (*Id.* at ¶ 132.)

That the plan sponsors filed the PDEs with CMS is irrelevant because liability attaches to any person who "causes to be presented" a false or fraudulent claim. The United States is not contending that the plan sponsor knowingly presented the false claim but rather that PharMerica knowingly "caused the claim" to be presented by the plan sponsor who then sought payment from the government. Such allegations comport with the statutory language and are supported by case law holding a subcontractor liable under the FCA for causing a subcontractor to submit claims seeking payment for materials that – unbeknowst to the contractor – were labeled incorrectly. *See Hutcheson v. Blackstone*

*Medical, Inc.*, 647 F.3d 377, 390 (1st Cir. 2011)(citing *U.S. v. Bornstein*, 423 U.S. 303, 309 (1976)).

The statute also requires that the claim be submitted to the United States for payment or approval. The United States asserts that the information provided to CMS by the plan sponsor in the form of the PDEs are the claims upon which CMS makes payment. (*Id.* at ¶¶ 53-56.). "Payments to a Part D plan sponsor are conditioned on the provision of information to CMS that is necessary for CMS to administer the Part D program and make payments to Part D plan sponsors for qualified prescription drug coverage." (*Id.* at ¶ 53.) These allegations are supported by the language of 42 C.F.R. § 423.322, as well as the case upon which PharMerica relies, *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125 (E.D. Pa. 2012). In *Spay*, the court cited CMS's instructions for the submission of Part D prescription PDE claims, which clarify that the "'information ... necessary to carry out this subpart' includes the data elements of a PDE." *Id.*, 913 F. Supp. 2d at 152.

The *Spay* court also addresses *U.S. ex rel.Wilkins v. United Health Group*, 659 F.3d 295 (3d Cir. 2011). PharMerica cited *Wilkins* for its holding that the alleged violation of Medicare marketing regulations were not conditions of payment, but conditions of participation. *Id.*, 659 F.3d at 309. However, the *Spay* court declined to apply *Wilkins* to the PDE regulations because PDE records – used by CMS for payment purposes – are simply not analogous to Medicare marketing regulations. *Spay*, 913 F. Supp. 2d. at 150. The *Spay* court commented that "when properly interpreted, 42 C.F.R. § 423.505(k) makes proper certification of data a 'condition of payment.'" "In turn, failure of either a Part D Plan sponsor or the Sponsor's subcontractor to submit accurate, complete, and truthful data related to payment may give rise to an FCA claim." *Id.*, 913 F. Supp. 2d at 151.

12

PharMerica also attacks the complaint on the ground that there is no loss to the government. Nevertheless, the United States alleges that CMS provides three different types of subsidies and the end-of-the-year reconciliation process compares the prospective payments with the actual costs on the PDEs and makes adjustments. (*Id.* at ¶¶ 57, 62.) The reconciliation methodology employed by the government and based on actual costs submitted by the plan sponsors is set forth in 42 C.F.R. § 423.315. By pleading this process and reliance on the actual costs, the United States has satisfied any requirement that the false statement be material to the claim and have a tendency to influence the government's actions by inflating the amount of its payment. *See generally U.S. ex. Rel. Garbe v. Kmart Corp.*, 968 F. Supp. 2d 978, 986 (N.D. Ill. 2013.)

Ultimately, the United States alleges that PharMerica submitted electronic claims to the beneficiary's Part D Plan and received reimbursement from the Part D plan sponsor. (*Id.* at ¶ 50.) The plan sponsor then notifies CMS that a drug has been purchased and dispensed through the PDE record. And, by engaging in this practice, PharMerica knowingly caused the plan sponsors to generate false PDEs that inaccurately or incompletely (1) identified these drugs as Part D drugs, (2) that were dispensed upon a valid prescription, and (3) by a prescriber with instructions. (*Id.* at ¶ 90.) The United States has stated a claim under the FCA.

In so holding, the court also finds that the United States has pled the FCA claims with the requisite particularity. PharMerica, a subcontractor, entered contracts with plan sponsors requiring PharMerica to comply with applicable federal laws and regulations, and 45% of PharMerica's revenue came from prescription drugs paid for by Medicare Part D. PharMerica sent claims for payment to plan sponsors for each dispensing event and the

13

plan sponsors created and submitted the PDEs based on the claims received from PharMerica. At paragraph 135 of the complaint, the United States alleges that it was reasonably foreseeable that PharMerica's practice of dispensing Schedule II controlled substances without valid prescriptions to residents of long-term care facilities would cause false PDEs and false certifications to be submitted to plan sponsors and false claims to be paid. Specifically, the United States asserts that on at least 250 occasions between January 1, 2007, and December 31, 2009, Schedule II drugs were dispensed by PharMerica without a proper prescription and offered three occasions when the PharMerica pharmacy dispensed a Schedule II drug for a patient (identified by initials) and received payment notwithstanding the absence of a written prescription. The plan sponsor, after receiving the electronic claims information from PharMerica, submitted the false PDE data, and CMS paid to the plan sponsor. (Id. at ¶¶ 50-51, 55, 67, 94-115.) The United States set forth the requirements for dispensing the covered drugs, submitting the claims pursuant to a contract with the plan sponsor, the requisite PDE data, the conditions for payment and the process for receiving payment under the Medicare Part D Program. It also described the three types of payments to Part D plan sponsors, the certification requirements, and alleged that the certification of data is used for the purposes of obtaining Federal reimbursement. (Id. at ¶¶ 47-72.) The 35-page complaint identifies the "who, what, where, when and how" of the alleged fraud and does so adequately.

Although PharMerica argues that there can be no liability where there is an adequate corrective action process, section 423.509 refers to the steps that CMS must take if it wishes to terminate a contract with a Part D plan sponsor. 42 C.F.R. § 423.509. If that section applies to PharMerica, the carve-out exception for fraud applies equally. 42 C.F.R.

§ 423.509(c)(2). The exception explains that the plan sponsor will not be provided with an opportunity to develop and implement a corrective action plan prior to termination if, "based on credible evidence," the Part D plan sponsor "has committed or participated in false, fraudulent or abusive activities affecting the Medicare, Medicaid, or other State or Federal health care programs." 42 C.F.R. § 423.509(c)(2)(iii) and (a)(4). Moreover, nothing in the statutory language precludes this FCA action against PharMerica regardless of the corrective process available to plan sponsors through the regulatory scheme.

Next, PharMerica moves to dismiss the claim for unjust enrichment under Rule 12(b)(6). To recover on a claim for unjust enrichment, a claimant must prove: (1) the claimants conferred a benefit upon the other party; (2) the other party had an appreciation or knowledge of the benefit; and (3) the other party accepted or retained the benefit under circumstances that would make it inequitable for the other party to retain the benefit without payment of its value. *Ludyjan v. Continental Cas. Co.*, 2008 WI App 41, ¶ 7, 308 Wis.2d 398, 747 N.W.2d 745. As outlined above, the United States has pled that PharMerica sought payment from Medicare Part D plan sponsors for drugs that were ineligible for coverage and that the PharMerica received and retained money from Medicare to which it was not entitled. (Doc. 44 at ¶¶ 153-154.) Alternative theories, such as unjust enrichment, may be plead at this stage.

As a final matter, PharMerica moves to dismiss Buth's retaliation claim. Section 3730(h) of the False Claims Act provides:

(h) Relief from retaliatory actions -

(1) In general. - Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the

15

> terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h). Hence, the amended complaint must contain facts that if proven would establish that: 1) Buth was acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA; 2) PharMerica knew Buth was engaged in protected conduct; and 3) PharMerica was motivated to take an adverse employment action against Buth because of her protected conduct. 31 U.S.C. § 3730(h).

PharMerica portrays Buth as "ineffective" and an "underperformer" who refused to work effectively with management and abruptly resigned nine months into her employment. Although PharMerica may make these arguments on summary judgment, one would not expect to find such allegations in the first amended complaint, which is the sole focus of the court at this time. PharMerica also maintains that Buth fails to allege "protected" activity or that PhaMerica was aware of such activity, and that she was not fired – she resigned. According to PharMerica, Buth complained to its managers that she was (1) unable to complete her compliance responsibilities without additional resources, and (2) that certain business practices were not in compliance with the federal rules governing the dispensing of prescription drugs. Such complaints are not "protected activity." *Brandon v. Anesthesia & Pain Mgmt. Assocs.,* Ltd., 277 F.3d 936, 945 (7th Cir. 2002).

It is true that *Brandon* held that if an employee's actions are not "in furtherance of" an enforcement action, but are for another reason such as encouraging the shareholders to comply with the Medicare billing regulations, then the conduct is not "protected conduct." *Id.,* 277 F.3d at 945 (citing *United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731,*

16

740 (D.C. Cir.1998)); *see* also *Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir.1997) ("Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [the plaintiff] was acting 'in furtherance of' a qui tam action."). However, since *Brandon*, Congress broadened the statute "to protect employees from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012). Specifically, the language "other efforts to stop 1 or more violation of this subchapter" encompasses more protected activity than did the prior statute. This amendment to the statute applies to conduct on or after its date of enactment on May 20, 2009. Pub. L. No. 111–21, § 4(f), 123 Stat. at 1625.

The court finds that Buth has stated a retaliation claim. Buth alleges that she was hired as a Pharmacy Operations Manager for PharAmerica's Pewaukee, Wisconsin, facility – not a compliance manager as alleged in the motion to dismiss. (Doc. 10 at ¶ 27.) Buth alleges her duties included "directing and managing the pharmacy staff; communicating with SNFs and ALFs, physicians, and related personnel involved in the purchasing of prescription products through PharMerica; working with PharMerica management to ensure compliance with state and federal regulations; and maintaining inventory and recordkeeping for controlled drugs." (*Id.* at ¶ 28.)

Buth further asserts that, beginning on or around March 16, 2009, she began raising questions with other members of management, including those charged with compliance with federal laws and regulations, regarding the manner in which defendant was handling, selling, billing, and dispensing controlled substances. (*Id.* at ¶ 29.) On April 27, 2009, she informed her supervisor, the General Manager of the Pewaukee facility, that she was

17

concerned regarding the practices and procedures related to dispensing Schedule II-V controlled narcotics were not in compliance with federal regulations. (*Id.* at ¶ 30.) On May 1, 2009, PharMerica's Wisconsin Human Resources Representative told Buth not to worry about an internal corporate compliance audit because PharMerica would "fix it later." (*Id.* at ¶ 32.) Buth sent an e-mail to the General Manager on May 6, 2009, reiterating her concerns that Pharmerica was violating federal regulations governing the handling of controlled narcotics by failing to secure signed prescriptions within seven days when dispensed on an emergency basis, failing to indicate the basis for an emergency dispense and by dispensing narcotics without signed prescriptions in non-emergency situations. (*Id.* at ¶ 34.) The General Manager of the Pewaukee facility responded that it was a "global or corporate wide problem" and that "corporate was aware of the scope of the non-compliance." (*Id.*)

Buth contacted the DEA on May 4, 2009, to discuss the non-compliance issues. Additionally, a Regulatory Consultant hired by PharMerica visited the Pewaukee facility on May 11 and 12, 2009, to conduct a corporate audit, and Buth showed them a large number of unsigned orders for controlled substances that had been dispensed and billed to the United States more than seven days before. (*Id.* at ¶ 36.) The Regulatory Consultant told Buth she should "get them cleaned up" because if the government audited them they could get $10,000 fine for each one." (*Id.*) Buth also told PharMerica's Corporate Compliance Agents that PharMerica's lack of oversight with respect to the narcotic boxes violated legal and billing requirements. (*Id.* At 38.) On May 13, 2009, the DEA inspected the Pewaukee facility and requested documents from Buth's desk. After the DEA left, the General Manager instructed Buth not to send the documents but to fix the documents by matching

them up with old prescriptions or by obtaining physician signatures and then send only the documents she could fix. (*Id.* at ¶ 41.)

Buth contacted PharMerica's Corporate Human Resources Representative and informed him that her General Manager had directed her to commit a felony in violation of 18 U.S.C. § 1001 by intentionally lying to the DEA by not reproducing the documents they requested, tampering with documents, and indicating that other documents were responsive. Buth sent a second e-mail on June 8, 2009, after receiving no response asking to be released from her employment contract based on PharMerica's failure to comply with the regulations governing the dispensing of Schedule II controlled narcotics and failure to assist her in correcting company practices. (*Id.* at ¶ 42.) The Corporate Human Resources Representative responded that if she resigned within two years of employment she would have to repay the $10,000 signing bonus." (*Id.*) He also told Buth that her General Manager was just "protecting the company." (*Id.* at ¶ 42.)

Finally, on July 23, 2009, Buth learned of the DEA raid on PharMerica's facility and helped gather the information demanded by the DEA. The General Manager and others witnessed Buth assisting the DEA and the General Manager heard Buth tell the DEA they had forgotten documents from her office. (*Id.* at ¶ 128.) The next day Richard Hollar — the same PharMerica Corporate Human Resources Representative that told Buth that the General Manager was just protecting the company and that she would have to repay the $10,000 signing bonus if she resigned – advised Buth that PharMerica had decided to eliminate her position at all locations and that she was terminated effective the following day on July 24, 2009. She was told the decision had been made on July 22, 2009, which was the same day as the DEA raid. (*Id.* at ¶ 130.)

Lastly, Buth alleges that PharMerica continued to recruit applicants for her former position at various locations, including Pewaukee, as of July 31, 2009. (*Id.* at ¶ 135.) Paragraph 137 adds that she was discharged because of her lawful conduct in furtherance of her efforts to stop PharMerica from violating its requirements for submission of claims to the government. (*Id.* at ¶ 137.) As such, she has stated a claim for retaliation. Now, therefore,

IT IS ORDERED that PharMerica's motion to dismiss counts three, four, and five of the complaint of the United States is denied.

IT IS FURTHER ORDERED that PharMerica's motion to dismiss the retaliation count of relator Jennifer Buth's first amended complaint is denied.

IT IS FURTHER ORDERED that the parties shall appear for a scheduling conference on October 20, 2014, at 2:00 p.m. in Courtroom 222.

Dated at Milwaukee, Wisconsin, this 3rd day of September, 2014.

                                                          BY THE COURT

                                                          /s/ C.N. Clevert, Jr.
                                                          C.N. CLEVERT, JR.
                                                          U.S. DISTRICT JUDGE